**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

J.R. and E.R., individually and
on behalf of I.R., a minor,

       Plaintiffs,

                       CASE NO.:

v.

                       <u>**JURY TRIAL DEMANDED**</u>

ORANGE COUNTY PUBLIC
SCHOOLS,

       Defendant.

_____/

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs J.R. and E.R., individually, and on behalf of I.R., a minor (collectively, "Plaintiffs"), by and through their undersigned attorneys, herby file this Complaint and sue Defendant Orange County Public Schools ("OCPS" or "Defendant"), and in support thereof, allege as follows:

1. This is an action for injunctive relief, declaratory relief, and compensatory damages brought by Plaintiffs against OCPS arising out of discrimination against Plaintiffs at the Windermere High School, Windermere, Florida, where IR, a minor, is a student. Plaintiffs J.R. and E.R. are the parents of I.R.

2. Plaintiffs allege claims against OCPS for violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq ("Title II" or "ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") for intentional discrimination, failure to provide reasonable accommodations related to I.R.'s use of her service animal, and for retaliation against Plaintiffs in violation of 42 U.S.C Section § 12203.

## JURISDICTION AND VENUE

3.   Jurisdiction of this Court is invoked pursuant to the ADA,  Section 504 and 28 U.S.C. §§ 1331 and 1343.

4.     Venue is in the District of the Middle District of Florida, Orlando Division, where OCPS is located has its principal place of business, and has sufficient contacts pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

5.     Plaintiffs J.R. and E.R. are the parents of I.R..  During all times mentioned in this Complaint, Plaintiff I.R. was a student at Windermere High School, a school that is part of the OCPS system.

6.     Defendant OCPS is a public school district with its principal office in Orlando, Florida.  Windermere High School is a school within that district, and OCPS has responsibilities to insure that such schools comply with federal and state law, including compliance with the ADA and Section 504.  Defendant is a public entity within the meaning of the ADA and Section 504.

### Supporting Facts

7.     As more fully set forth herein, during all times mentioned in this Complaint, Plaintiff I.R. is a qualified person with a disability within the meaning of the ADA and Section 504.  She has Type I diabetes, and is, by reason of her disability, excluded from participation in and denied the benefits of the services, programs, and activities of Defendant, and was subject to discrimination from Defendant.

9.     I.R. and a service dog have been attending OCPS schools as handler and Service Animal since 8th grade, and this is their third year as handler and Service Animal.  Since 2018, Plaintiff IR has had the support and assistance of a Service Dog named "Eberly".  Eberly is a

highly trained, certified service animal, that, among other things, is able to detect blood glucose highs above 180 points and lows below 80.  She is also capable of detecting trends and alerts to pending highs or lows 10-15 minutes prior to electronic medical devises.  Eberly's training gives her the ability to go to another part of the Plaintiffs' home to alert I.R.'s parents in the event Eberly cannot waken I.R. from an overnight low.  In short, Eberly, who undoubtedly has saved I.R.'s life on more than one occasion, provides critical life-saving support to I.R., who could not function normally without Eberly.  I.R. has undergone extensive training to work with Eberly, is Eberly's "handler", and asserts control over Eberly through both physical tethering as well as verbal and other signals.  Eberly is specifically trained to work off-leash when necessary.

10.     Defendant is fully aware of both the nature and extent of Plaintiff I.R.'s disability. I.R. participates in OCPS's Section 504 plan which explicitly acknowledges that I.R.'s Type I Diabetes substantially limits one or more of her major life activities, describing it as impacting her learning.  OCPS also participated in a "Diabetes Action Plan" for I.B., which was made available to appropriate staff with a copy placed in her substitute folder.  The most recent Diabetes Action Plan is dated August 21, 2020.  The Diabetes Action Plan also reflects the nature and severity of Type 1 Diabetes, and includes "special needs" directions to permit I.R. to test blood sugar levels as often as needed, as well as the statement that I.R. has a personal Service Dog.

11.     I.R. is very interested and involved in Windermere High School's theatre arts and dance programs.  Given that I.R.'s participation in these activities necessarily meant that she would not be able to physically hold Eberly on a tether, she would, when necessary, put Eberly in a "down stay" position through a verbal control.  This procedure was consistently used by I.R. without incident or complaint from OCPS.  This "down stay" control is important for I.R. to participate in school activities such as dance and theatre.

12.     Within the first two days of the 2020 school year, I.R., whose condition renders her immunocompromised, noted that a teacher was not wearing a mask as required for COVID-19 under OCPS and Orange County regulations.  I.R.'s mother, E.R. contacted the school to notify them of her concern over I.R.'s exposure to a non-mask wearing teacher given her medical condition, and asked that I.R. be removed from the class.  This simple request led to a campaign of retaliation against I.R. and her family  for having the temerity to ask for the reasonable, indeed, necessary accommodation of having I.R. removed from the class.

13.     Instead of granting the accommodation, OCPS unfairly and inaccurately claimed I.R. was in breach of OCPS misconduct rules because she was leaving class early, a claim not made prior to the mask incident with the teacher.  Then OCPS doubled down by opening an "investigation" into whether I.R. was leaving class early; an "investigation" that was punitive and intended to retaliate against I.R. and her family for complaining about a teacher failing to comply with proper protocol concerning mask wearing, a protection critically important to someone with Belle's immunocompromised condition.  This 'investigation', which included both video-taping and personal surveillance, has had significant negative medical impacts upon I.R., who is made to feel like a pariah because of her condition.

14.     During this 'investigation', OCPS was reminded that since 8th grade I.R. had been permitted to leave class a few minutes early so she could move from class to class before hallways became too crowded and to give I.R. a chance to give Eberly water or take a break, when necessary.  Given that the school is quite crowded, this procedure was always understood by OCPS to be both reasonable and prudent, a position that only changed after the teacher mask incident.

15.     Since the teacher mask incident, I.R. has been the subject of OCPS monitoring through both video and personal surveillance.  Incredibly, the teacher who refused to wear a mask

actually told I.R. that she was going to speak to OCPS administration to make sure that some of I.R.'s 504 Plan accommodations would be changed.

16.     Further evidence of Defendant's unlawful retaliation is shown in OCPS's change in its consistent history of permitting I.R. to place Eberly in a "down stay" during theatre and dance.  After the teacher mask incident, I.R. and her family were informed that this would no longer be permitted.  When Plaintiffs expressed their shock and dismay over this sudden change, reminding OCPS that there had never been an incident with Eberly not being in control during theatre and dance, or at any other time, and that without the ability to place Eberly in a "down stay" position, I.R. would not be able to safely continue in these classes, OCPS's representative stated that the rule now was that unless I.R. could hold the leash or have it physically tethered to her body, with Eberly not more than 24 inches from her, she could no longer participate in either class.  This "new rule" was directly at odds with the policy explained to Plaintiffs when I.R. first started bringing Eberly to school at the beginning of 8th grade; that a leash was not required as long as Eberly wasn't out of control.  And she never was.  The "new rule" was also at odds with consistent practice of permitting I.R. to control Eberly with commands.

17.     Notwithstanding the fact of its own prior policies concerning service animals, OCPS actually told Plaintiff that if I.R. put down Eberly's leash, both the dog and I.R. would be permanently removed from campus.  This threat is further evidence of retaliation against Plaintiffs as well as a gross misrepresentation of what the law is concerning control of Service Animals.

18.     Upset by what they correctly perceived as illegal treatment under the ADA, and concerned about the health and well-being of I.R., Plaintiffs sought legal assistance from the undersigned in early September, 2020, which resulted in a September 14, 2020 e-mail letter to an OCPS attorney Plaintiffs had been dealing with concerning I.R.  The letter, which was e-mailed to

5

OCPS at 11:01 A.M on September 14th, included a narrative of the facts concerning Defendant's change in its treatment of I.R. after the mask complaint, including the changes in school policy toward I.R. and Eberly.  The letter explained in detail that Plaintiffs viewed the OCPS mask response and about-face in I.R.'s handling of Eberly as retaliation for her request for a reasonable accommodation concerning the mask incident, and that OCPS's demands for "physical tethering" of I.R. to Eberly were not required by federal law.  The letter noted that Plaintiff's requests for reasonable accommodation on the mask and not having Eberly physically tethered to I.R. were both reasonable and necessary, and invited OCPS to engage in a discussion focused upon solutions instead of legal posturing.

19.     The September 14, 2020 letter was ignored.  Instead, Plaintiffs received a telephone call on September 15, 2020 from a person who did not identify themselves, but is believed to have been from Windermere High School stating that Plaintiffs were about to receive a "very important email and to have a nice day."  Later that same day, Plaintiffs received a letter dated September 15, 2020 from OCPS counsel's office which, among other things, purported to formally notify Plaintiffs that I.R.'s Service Animal, Eberly, "may no longer enter OCPS campus, effective immediately."  The stated basis for the decision was essentially that Eberly was out of control, a position factually inaccurate, inconsistent with OCPS's own policy as well as federal law concerning control of a service animal.

20.     Plaintiffs, through their counsel, thereafter wrote Defendant on September 19, 2020 trying to persuade OCPS that its decision to bar Eberly from high school (thereby effectively barring I.R.) was based upon a flawed reading of Florida law on service animals, and that OCPS's legal argument was contrary to federal and state law, as well as OCPS's own policy (Policy IMG). The letter further noted that OCPS's position pointedly ignored case law from the Middle District

of Florida cited in counsel's September 14, 2020 letter that included the caution that separating an individual from her service animal can cause irreparable harm and deprive that individual of independence.  Lastly, the letter advised OCPS that its arbitrary and vindictive decision to bar Eberly, and therefore I.R. from high school inflicted the very harm the cited case law cautioned against, concluding that "since, as you should well know, it is medically unsafe for [I.R.] to attend school without Eberly, OCPS has effectively barred I.R. from school, and she will not be returning until this is sorted out.  Please so inform her teachers.  While out, she will be keeping up remotely."

21.     Instead of engaging with Plaintiffs on the issue of I.R.'s use of her service animal and addressing the mask incident, OCPS's insisted that its refusal to permit I.R. to return to school with Eberly was made, and would not be changed.

22.     Since OCPS continues to refuse to permit I.R. to return to school with Eberly, she is attending class remotely, but is barred from participating in live attendance.   This prohibition means that she cannot participate in theatre and dance, loses the social interaction that is an integral part of the high school experience, and is generally made to feel like a social pariah.

### FIRST CAUSE OF ACTION
(Intentional Discrimination under the ADA)

23.     Plaintiffs repeat and reallege the allegations in paragraphs "1" through "22".

24.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Plaintiff I.R. is qualified individual with a disability within the meaning of 42 U.S.C. § 12132. Defendant itself acknowledges I.R.'s disability, and its impact on her major life activities. Defendant's refusal to require I.R.'s teacher to wear a mask in class notwithstanding its knowledge that I.R.'s highly immunocompromised condition, not to mention OCPS regulations mandating it

was intentional discrimination against Plaintiffs.  Defendant's decision to bar Eberly from school in violation of its own policy guidelines and federal law knowing that its action necessarily meant that I.R. was barred from school was similarly done because of Plaintiff I.R.'s disability. Any claim that OCPS's decision to bar Eberly because she was "out of control" is pretext, and thinly veiled pretext at that.  Further evidence of OCPS's intentional discrimination is its decision to refuse Plaintiff's request for the reasonable accommodation of permitting I.R. to control Eberly through voice commands and signals, just as she had been doing prior to September, 2020 abrupt change of OCPS policy.

25.     Plaintiff I.R. has been excluded from and otherwise denied the benefits of the services, programs and activities of OCPS and been otherwise discriminated against, by *inter alia*, being able to attend school along with other classmates, instead having to rely upon remote attendance that bars her from participation in dance and theatre classes that she loved as well as interaction with classmates and peers that are critically important to a high school teenager. Moreover, OCPS's cavalier treatment, including their decision to monitor I.R.'s activities through having her followed and observed during school and by video-taping has had an emotional and mental impact upon Plaintiff I.R. who has been made to feel like a social pariah and miscreant. Defendant knew that its actions were substantially likely to result in harm to Plaintiff's federally protected rights, and intentionally took the actions anyway.  This deliberate indifference to Plaintiffs' rights warrants compensatory damages to Plaintiffs.

26.     Defendant's aforesaid denial of benefits and discrimination against Plaintiff I.R. was directly related to her disability, a fact reflected in Defendant's refusal to admonish I.R.'s teacher to wear a mask even though this was a requirement of OCPS's own policy and critically important for I.R., whose disability leaves her highly immunocompromised; OCPS's subsequent

campaign of harassment and retaliation against Plaintiffs for asking that the teacher be required to wear a mask through complaints of early departures from classes when such departures were previously permitted and necessary for I.R.; factually inaccurate claims that Eberly was "out of control" during various parts of the school day when its own videos showed otherwise; insistence that Eberly had to be physically tethered to I.R.at  all times when neither OCPS's policy nor federal law require it; and barring Eberly from returning to school with I.R. after receiving counsel's letter complaining about discrimination against I.R. knowing full well that this action necessarily meant that I.R. could not return to school.

WHEREFORE, Plaintiffs respectfully request this Court

(a)  Declare Defendant's actions complained of herein to be in violation of the ADA;

(b)  Order Defendant to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendant or nay of its agents;

(c)  Permanently enjoin Defendant, their agents, employees and successors from discriminating against any person in violation of the ADA;

(d)  Award Plaintiffs appropriate compensatory damages against Defendant;

(e)  Award Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. §12205; and

(f)  Provide Plaintiffs such other and further relief as this Court may deem just, proper and equitable.

## SECOND CAUSE OF ACTION
(Intentional Discrimination under Section 504)

27.    Plaintiffs repeat the allegations in paragraphs "1" through "22".

28.     Under Section 504, Plaintiff I.R., an otherwise qualified person with a disability, could not, solely by reason of her disability, be excluded from the participation in, or be denied the benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance.

29.     Defendant unlawfully discriminated against Plaintiffs under Section 504. Plaintiff I.R. is disabled person within the meaning of Section 504 in that she suffers from an impairment, Type I diabetes, that substantially limits one or more of her major life activities; among others, learning.  I.R. participates in OCPS's Section 504 plan which explicitly acknowledges that I.R.'s Type I Diabetes substantially limits one or more of her major life activities, describing it as impacting her learning.  OCPS also participated in a "Diabetes Action Plan" for I.R., which was made available to appropriate staff with a copy placed in her substitute folder.  The most recent Diabetes Action Plan is dated August 21, 2020.  The Diabetes Action Plan also reflects the nature and severity of Type 1 Diabetes, and includes "special needs" directions to permit I.R. to test blood sugar levels as often as needed, as well as the statement that I.R. has a personal Service Dog. Defendant itself acknowledges I.R.'s disability, and its impact on her major life activities.

30.     Defendant's refusal to require I.R.'s teacher to wear a mask in class notwithstanding its knowledge that I.R.'s highly immunocompromised condition, not to mention OCPS regulations mandating it was intentional discrimination against Plaintiffs.  Defendant's decision to bar Eberly from school in violation of its own policy guidelines and federal law knowing that its action necessarily meant that I.R. was barred from school was similarly done because of Plaintiff I.R.'s disability. Any claim that OCPS's decision to bar Eberly because she was "out of control" is pretext, and thinly veiled pretext at that.  Further evidence of OCPS's intentional discrimination is its decision to refuse Plaintiff's request for the reasonable

accommodation of permitting I.R. to control Eberly through voice commands and signals, just as she had been doing prior to September, 2020 abrupt change of OCPS policy.

31.     Plaintiff I.R. has been excluded from and otherwise denied the benefits of the services, programs and activities of OCPS and been otherwise discriminated against, by *inter alia*, her inability to attend school along with other classmates, instead having to rely upon remote attendance that bars her from participation in dance and theatre classes that she loved as well as interaction with classmates and peers that are critically important to a high school teenager. Moreover, OCPS's cavalier treatment, including their decision to monitor I.R.'s activities through having her followed and observed during school and by video-taping has had an emotional and mental impact upon Plaintiff I.R. who has been made to feel like a social pariah and miscreant. Defendant knew that its actions were substantially likely to result in harm to Plaintiff's federally protected rights, and intentionally took the actions anyway.  This deliberate indifference to Plaintiffs' rights warrants compensatory damages to Plaintiffs.

32.     Defendant's aforesaid denial of benefits and discrimination against Plaintiff I.R. was directly related to her disability, a fact reflected in Defendant's refusal to admonish I.R.'s teacher to wear a mask even though this was a requirement of OCPS's own policy and critically important for I.R., whose disability leaves her highly immunocompromised; OCPS's subsequent campaign of harassment and retaliation against Plaintiffs for asking that the teacher be required to wear mask through complaints of early departures from classes when such departures were previously permitted and necessary for I.R.; factually inaccurate claim that Eberly was "out of control" during various parts of the school day when its own videos showed otherwise; insistence that Eberly had to be physically tethered to I.R.at  all times when neither OCPS's previously policy nor federal law require it; and barring Eberly from returning to school with I.R. after receiving

counsel's letter complaining about discrimination against I.R. knowing full well that their action necessarily meant that I.R. could not return to school.

WHEREFORE, Plaintiffs respectfully request this Court

(a)  Declare Defendant's actions complained of herein to be in violation of Section 504;

(b)  Order Defendant to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendant or nay of its agents;

(c)  Permanently enjoin Defendant, their agents, employees and successors from discriminating against any person in violation of Section 504;

(d)  Award Plaintiffs appropriate compensatory damages against Defendant;

(e)  Award Plaintiffs attorney's fees and costs pursuant to 29 U.S.C. § 794(a); and

(f)  Provide Plaintiffs such other and further relief as this Court may deem just, proper and equitable.

## **THIRD CAUSE OF ACTION**
(Failure to Accommodate under the ADA)

33.  Plaintiffs repeat the allegations in paragraphs "1" through "22".

34.  Defendant, as a public entity, has a duty to make reasonable accommodations in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability.  Specifically, Defendant is obligated to modify its policies, practices and procedures to permit the use of a service animal by an individual with a disability.

35.  Plaintiff is a person with a disability, Type I diabetes, a fact acknowledged by Defendant in, among other things, its 504 plan for Plaintiff.

12

36.     Defendant failed to reasonably accommodate Plaintiffs in violation of the ADA, 42 U.S.C. Section 12182(b)(A)(ii) in that OCPS failed and refused to make reasonable accommodations to its policies concerning service animals and permit I.R. to attend school with her service dog Eberly as she had previously done for years.  And, here, there was no reason for Defendant, which had permitted Plaintiff I.R. to attend all programs and activities with Eberly, to abruptly change their position and bar Eberly from the school, thereby effectively barring I.R.

37.     Defendant's failure and refusal to grant Plaintiff I.R. the reasonable accommodations requested; that is, to continue to permit I.R. to attend classes, including her theatre and dance program with Eberly under control, was unlawful discrimination as a result of her disability.

38.     Defendant's refusal to reasonably accommodate Plaintiffs has resulted in Plaintiff I.R.'s  exclusion from and otherwise denial of the benefits of the services, programs and activities of OCPS and been otherwise discriminated against, by *inter alia*,   being able to attend school along with other classmates, instead having to rely upon remote attendance that bars her from participation in dance and theatre classes that she loved as well as interaction with classmates and peers that are critically important to a high school teenager.  Moreover, OCPS's cavalier treatment, including their decision to monitor I.R.'s activities through having her followed and observed during school and by video-taping has had an emotional and mental impact upon Plaintiff I.R. who has been made to feel like a social pariah and miscreant.  Defendant knew that its actions were substantially likely to result in harm to Plaintiff's federally protected rights, and intentionally took the actions anyway.  This deliberate indifference to Plaintiffs' rights warrants compensatory damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request this Court

(a)  Declare Defendant's actions complained of herein to be in violation of ADA;

(b)  Order Defendant to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendant or any of its agents;

(c)  Permanently enjoin Defendant, their agents, employees and successors from discriminating against any person in violation of ADA;

(d)  Award Plaintiffs appropriate compensatory damages against Defendant;

(e)  Award Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. §12205; and

(f)  Provide Plaintiffs such other and further relief as this Court may deem just, proper and equitable.

## FOURTH CAUSE OF ACTION
(Failure to Accommodate under Section 504)

39.     Plaintiffs repeat the allegations in paragraphs "1" through "22".

40.     Defendant, as a public entity, has a duty to make reasonable accommodations in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability.  Specifically, Defendant is obligated to modify its policies, practices and procedures to permit the use of a service animal by an individual with a disability.

41.     Plaintiff is a person with a disability, Type I diabetes, a fact acknowledged by Defendant in, among other things, its 504 plan for Plaintiff.

42.     Defendant failed to reasonably accommodate Plaintiffs in violation of Section 504 in that OCPS failed and refused to make reasonable accommodations to its policies concerning service animals and permit I.R. to attend school with her service dog Eberly as she had previously done for years.  And, here, there was no reason for Defendant, which had permitted Plaintiff I.R.

14

to attend all programs and activities with Eberly, to abruptly change their position and bar Eberly from the school, thereby effectively barring I.R.

43.     Defendant's failure and refusal to grant Plaintiff I.R. the reasonable accommodations requested; that is, to continue to permit I.R. to attend classes, including her theatre and dance program with Eberly under control, was unlawful discrimination as a result of her disability.

44.     Defendant's refusal to reasonably accommodate Plaintiffs has resulted in Plaintiff I.R.'s  exclusion from and otherwise denial of the benefits of the services, programs and activities of OCPS and been otherwise discriminated against, by *inter alia*,   being able to attend school along with other classmates, instead having to rely upon remote attendance that bars her from participation in dance and theatre classes that she loved as well as interaction with classmates and peers that are critically important to a high school teenager.  Moreover, OCPS's cavalier treatment, including their decision to monitor I.R.'s activities through having her followed and observed during school and by video-taping has had an emotional and mental impact upon Plaintiff I.R. who has been made to feel like a social pariah and miscreant.  Defendant knew that its actions were substantially likely to result in harm to Plaintiff's federally protected rights, and intentionally took the actions anyway.  This deliberate indifference to Plaintiffs' rights warrants compensatory damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request this Court

(a)  Declare Defendant's actions complained of herein to be in violation of Section 504;

(b)  Order Defendant to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendant or any of its agents;

(c)  Permanently enjoin Defendant, their agents, employees and successors from discriminating against any person in violation of Section 504;

(d)  Award Plaintiffs appropriate compensatory damages against Defendant;

(e)  Award Plaintiffs attorney's fees and costs pursuant to 29 U.S.C. § 794(a); and

(f)  Provide Plaintiffs such other and further relief as this Court may deem just, proper and equitable.

## FIFTH CAUSE OF ACTION
(Retaliation under the ADA)

45.     Plaintiffs repeat the allegations in paragraphs "1" through "22".

46.     Defendant unlawfully retaliated against Plaintiffs in violation of 42 U.S.C. § 12203 in that they coerced, intimidated, threatened and/or interfered with Plaintiffs' exercise and enjoyment of rights granted or protected under the ADA.

47.     Defendant's retaliation against Plaintiffs commenced shortly after the commencement of the 2020 school year.  I.R., whose condition renders her immunocompromised, noted that a teacher was not wearing a mask as required for COVID-19 under OCPS and Orange County regulations.  I.R.'s mother, E.R. contacted the school to notify them of her concern over I.R.'s exposure to a non-mask wearing teacher given her medical condition, and asked that I.R. be removed from the class.  Instead of granting the request or otherwise accommodating Plaintiffs, Defendant embarked upon a campaign of retaliation against I.R. and her family.

48.     OCPS unfairly and inaccurately claimed I.R. was in breach of OCPS misconduct rules because she was leaving class early, a claim not made prior to the mask incident with the teacher.  Then OCPS doubled down by opening an "investigation" into whether I.R. was leaving class early; an "investigation" that was punitive and intended to retaliate against I.R. and her family

for complaining about a teacher failing to comply with proper protocol concerning mask wearing, a protection critically important to someone with I.R.'s immunocompromised condition. This 'investigation' has had significant negative medical impacts upon I.R., who is made to feel like a pariah because of her condition.

49.     During this 'investigation', OCPS was reminded that since 8th grade I.R. had been permitted to leave class a few minutes early so she could move from class to class before hallways became too crowded and to give I.R. a chance to give Eberly water or take a break, when necessary. Given that the school is quite crowded, this procedure was always understood by OCPS to be both reasonable and prudent, a position that only changed after the teacher mask incident.

50.     Since the teacher mask incident, I.R. has been the subject of OCPS monitoring through both video and personal surveillance. Incredibly, the teacher who refused to wear a mask actually told I.R. that she was going to speak to OCPS administration to make sure that some of I.R.'s 504 Plan accommodations would be changed.

51.     Further evidence of Defendant's unlawful retaliation is shown in OCPS's change in its consistent history of permitting I.R. to place Eberly in a "down stay" during theatre and dance. After the teacher mask incident, I.R. and her family were informed that this would no longer be permitted. When Plaintiffs expressed their shock and dismay over this sudden change, reminding OCPS that there had never been an incident with Eberly not being in control during theatre and dance, or at any other time, and that without the ability to place Eberly in a "down stay" position, I.R. would not be able to safely continue in these classes, OCPS's representative stated that the rule now was that unless I.R. could hold the leash or have it tethered to her body, with Eberly not more than 24 inches from her, she could no longer participate in either class. This "new rule" was directly at odds with the policy explained to Plaintiffs when I.R. first started

bringing Eberly to school at the beginning of 8th grade; that a leash was not required as long as Eberly wasn't out of control.  And she never was.

52.     Notwithstanding the fact of its own prior policies concerning service animals, OCPS actually told Plaintiff that if I.R. put down Eberly's leash, both the dog and I.R. would be permanently removed from campus.  This threat is further evidence of retaliation against Plaintiffs as well as a gross misrepresentation of what the law is concerning control of Service Animals.

53.     Upset by what they correctly perceived as illegal treatment under the ADA, and concerned about the health and well-being of I.R., Plaintiffs sought legal assistance from the undersigned in early September, 2020, which resulted in a September 14, 2020 e-mail letter to an OCPS attorney Plaintiffs had been dealing with concerning I.R.  The letter, which was e-mailed to OCPS at 11:01 A.M on September 14th, included a narrative of the facts concerning Defendant's change in its treatment of I.R. after the mask complaint, including the changes in school policy toward I.R. and Eberly.  The letter explained in detail that Plaintiffs viewed the OCPS mask response and about-face in I.R.'s handling of Eberly as retaliation for her request for a reasonable accommodation concerning the mask incident, and that OCPS's demands for "physical tethering" of  I.R. to Eberly were not required by federal law.  The letter noted that Plaintiff's requests for reasonable accommodation on the mask and not having Eberly physically tethered to I.R. were both reasonable and necessary, and invited OCPS to engage in a discussion focused upon solutions instead of legal posturing.

54.     The September 14, 2020 letter was ignored.  Instead, Plaintiffs received a telephone call on September 15, 2020 from a person who did not identify themselves, but is believed to have been from Windermere High School stating that Plaintiffs were about to receive a "very important email and to have a nice day."  Later that same day, Plaintiffs received a letter dated September

15, 2020 from OCPS counsel's office which, among other things, purported to formally notify Plaintiffs that I.R.'s Service Animal, Eberly, "may no longer enter OCPS campus, effective immediately." The stated basis for the decision was essentially that Eberly was out of control, a position factually inaccurate, inconsistent with OCPS's own policy as well as federal law concerning control of a service animal.

55.     Plaintiffs, through their counsel, thereafter wrote Defendant on September 19, 2020 trying to persuade OCPS that its decision to bar Eberly from high school (thereby effectively barring I.R.) was based upon a flawed reading of Florida law on service animals, and that OCPS's legal argument was contrary to federal and state law, as well as OCPS's own policy (Policy IMG). The letter further noted that OCPS's position pointedly ignored case law from the Middle District of Florida cited in counsel's September 14, 2020 letter that included the caution that separating an individual from her service animal can cause irreparable harm and deprive that individual of independence. Lastly, the letter advised OCPS that its arbitrary and vindictive decision to bar Eberly, and therefore I.R. from high school inflicted the very harm the cited case law cautioned against, concluding that "since, as you should well know, it is medically unsafe for [I.R.] to attend school without Eberly, OCPS has effectively barred I.R. from school, and she will not be returning until this is sorted out. Please so inform her teachers. While out, she will be keeping up remotely."

56.     Instead of engaging with Plaintiffs on the issue of I.R.'s use of her service animal and addressing the mask incident, OCPS's insisted that its refusal to permit I.R. to return to school with Eberly was made, and would not be changed.

57.     Since OCPS continues to refuse to permit I.R. to return to school with Eberly, she is attending class remotely, but is barred from participating in live attendance. This prohibition means that she cannot participate in theatre and dance, loses the social interaction that is an integral

part of the high school experience, and is generally made to feel like a social pariah.  These consequences constitute adverse actions which are causally related to Plaintiff's protected expressions in violation of the ADA and of 42 U.S.C. § 12203.

58.    Defendant's retaliation against Plaintiffs has had severe adverse consequences, including Plaintiff I.R.'s  exclusion from and otherwise denial of the benefits of the services, programs and activities of OCPS; not being able to attend school along with other classmates, instead having to rely upon remote attendance that bars her from participation in dance and theatre classes that she loved; as well as interaction with classmates and peers that are critically important to a high school teenager.  Moreover, OCPS's cavalier treatment, including their decision to monitor I.R.'s activities through having her followed and observed during school and by video-taping has had an emotional and mental impact upon Plaintiff I.R. who has been made to feel like a social pariah and miscreant.  Defendant knew that its actions were substantially likely to result in harm to Plaintiff's federally protected rights, and intentionally took the actions anyway.  This deliberate indifference to Plaintiffs' rights warrants compensatory damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request this Court

(a)  Declare Defendant's actions complained of herein to be in violation of the ADA and retaliatory in violation of 42 U.S.C. § 12203;

(b)  Order Defendant to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendant or any of its agents;

(c)  Permanently enjoin Defendant, their agents, employees and successors from discriminating against any person in violation of the ADA and 42 U.S.C. § 12203;

(d)  Award Plaintiffs appropriate compensatory damages against Defendant;

(e)  Award Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. §12205;

and

(f)  Provide Plaintiffs such other and further relief as this Court may deem just, proper and equitable.

## SIXTH CAUSE OF ACTION
(Retaliation under Section 504)

59.     Plaintiffs repeat the allegations in paragraphs "1" through "22".

60.     Defendant unlawfully retaliated against Plaintiffs in violation of 42 U.S.C. § 12203 in that they coerced, intimidated, threatened and/or interfered with Plaintiffs' exercise and enjoyment of rights granted or protected under Section 504.

61.     Defendant's retaliation against Plaintiffs commenced shortly after the commencement of the 2020 school year.  I.R., whose condition renders her immunocompromised, noted that a teacher was not wearing a mask as required for COVID-19 under OCPS and Orange County regulations.  I.R.'s mother, E.R. contacted the school to notify them of her concern over I.R.'s exposure to a non-mask wearing teacher given her medical condition, and asked that I.R. be removed from the class.  Instead of granting the request or otherwise accommodating Plaintiffs, Defendant embarked upon a campaign of retaliation against I.R. and her family.

62.     OCPS unfairly and inaccurately claimed I.R. was in breach of OCPS misconduct rules because she was leaving class early, a claim not made prior to the mask incident with the teacher.  Then OCPS doubled down by opening an "investigation" into whether I.R. was leaving class early; an "investigation" that was punitive and intended to retaliate against I.R. and her family for complaining about a teacher failing to comply with proper protocol concerning mask wearing, a protection critically important to someone with Belle's immunocompromised condition.  This 'investigation" has had significant negative medical impacts upon I.R., who is made to feel like a pariah because of her condition.

63.     During this 'investigation", OCPS was reminded that since 8th grade I.R. had been permitted to leave class a few minutes early so she could move from class to class before hallways became too crowded and to give I.R. a chance to give Eberly water or take a break, when necessary. Given that the school is quite crowded, this procedure was always understood by OCPS to be both reasonable and prudent, a position that only changed after the teacher mask incident.

64.     Since the teacher mask incident, I.R. has been the subject of OCPS monitoring through both video and personal surveillance.  Incredibly, the teacher who refused to wear a mask actually told I.R. that she was going to speak to OCPS administration to make sure that some of I.R.'s 504 Plan accommodations would be changed.

65.     Further evidence of Defendant's unlawful retaliation is shown in OCPS's change in its consistent history of permitting I.R. to place Eberly in a "down stay" during theatre and dance.  After the teacher mask incident, I.R. and her family were informed that this would no longer be permitted.  When Plaintiffs expressed their shock and dismay over this sudden change, reminding OCPS that there had never been an incident with Eberly not being in control during theatre and dance, or at any other time, and that without the ability to place Eberly in a "down stay" position, I.R. would not be able to safely continue in these classes, OCPS's representative stated that the rule now was that unless I.R. could hold the leash or have it tethered to her body, with Eberly not more than 24 inches from her, she could no longer participate in either class.  This "new rule" was directly at odds with the policy explained to Plaintiffs when I.R. first started bringing Eberly to school at the beginning of 8th grade; that a leash was not required as long as Eberly wasn't out of control.  And she never was.

65.     Notwithstanding the fact of its own prior policies concerning service animals, OCPS actually told Plaintiff that if I.R. put down Eberly's leash, both the dog and I.R. would be

permanently removed from campus.  This threat is further evidence of retaliation against Plaintiffs as well as a gross misrepresentation of what the law is concerning control of Service Animals.

66.     Upset by what they correctly perceived as illegal treatment under the ADA, and concerned about the health and well-being of I.R., Plaintiffs sought legal assistance from the undersigned in early September, 2020, which resulted in a September 14, 2020 e-mail letter to an OCPS attorney Plaintiffs had been dealing with concerning I.R.  The letter, which was e-mailed to OCPS at 11:01 A.M on September 14th, included a narrative of the facts concerning Defendant's change in its treatment of I.R. after the mask complaint, including the changes in school policy toward I.R. and Eberly.  The letter explained in detail that Plaintiffs viewed the OCPS mask response and about-face in I.R.'s handling of Eberly as retaliation for her request for a reasonable accommodation concerning the mask incident, and that OCPS's demands for "physical tethering" of  I.R. to Eberly were not required by federal law.  The letter noted that Plaintiff's requests for reasonable accommodation on the mask and not having Eberly physically tethered to I.R. were both reasonable and necessary, and invited OCPS to engage in a discussion focused upon solutions instead of legal posturing.

67.     The September 14, 2020 letter was ignored.  Instead, Plaintiffs received a telephone call on September 15, 2020 from a person who did not identify themselves, but is believed to have been from Windermere High School stating that Plaintiffs were about to receive a "very important email and to have a nice day."  Later that same day, Plaintiffs received a letter dated September 15, 2020 from OCPS counsel's office which, among other things, purported to formally notify Plaintiffs that I.R.'s Service Animal, Eberly, "may no longer enter OCPS campus, effective immediately."  The stated basis for the decision was essentially that Eberly was out of control, a

position factually inaccurate, inconsistent with OCPS's own policy as well as federal law concerning control of a service animal.

68.     Plaintiffs, through their counsel, thereafter wrote Defendant on September 19, 2020 trying to persuade OCPS that its decision to bar Eberly from high school (thereby effectively barring I.R.) was based upon a flawed reading of Florida law on service animals, and that OCPS's legal argument was contrary to federal and state law, as well as OCPS's own policy (Policy IMG). The letter further noted that OCPS's position pointedly ignored case law from the Middle District of Florida cited in counsel's September 14, 2020 letter that included the caution that separating an individual from her service animal can cause irreparable harm and deprive that individual of independence.  Lastly, the letter advised OCPS that its arbitrary and vindictive decision to bar Eberly, and therefore I.R. from high school inflicted the very harm the cited case law cautioned against, concluding that "since, as you should well know, it is medically unsafe for [I.R.] to attend school without Eberly, OCPS has effectively barred I.R. from school, and she will not be returning until this is sorted out.  Please so inform her teachers.  While out, she will be keeping up remotely."

69.     Instead of engaging with Plaintiffs on the issue of I.R.'s use of her service animal and addressing the mask incident, OCPS's insisted that its refusal to permit I.R. to return to school with Eberly was made, and would not be changed.

70.     Since OCPS continues to refuse to permit I.R. to return to school with Eberly, she is attending class remotely, but is barred from participating in live attendance.   This prohibition means that she cannot participate in theatre and dance, loses the social interaction that is an integral part of the high school experience, and is generally made to feel like a social pariah.  These consequences constitute adverse actions which are causally related to Plaintiff's protected expressions in violation of the ADA and of 42 U.S.C. § 12203.

24

71.    Defendant's retaliation against Plaintiffs has had severe adverse consequences, including Plaintiff I.R.'s exclusion from and otherwise denial of the benefits of the services, programs and activities of OCPS; not being able to attend school along with other classmates, instead having to rely upon remote attendance that bars her from participation in dance and theatre classes that she loved; as well as interaction with classmates and peers that are critically important to a high school teenager.   Moreover, OCPS's cavalier treatment, including their decision to monitor I.R.'s activities through having her followed and observed during school and by video-taping has had an emotional and mental impact upon Plaintiff I.R. who has been made to feel like a social pariah and miscreant.   Defendant knew that its actions were substantially likely to result in harm to Plaintiff's federally protected rights, and intentionally took the actions anyway.   This deliberate indifference to Plaintiffs' rights warrants compensatory damages to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request this Court

(a)  Declare Defendant's actions complained of herein to be in violation of Section 504 and retaliatory in violation of 42 U.S.C. § 12203;

(b)  Order Defendant to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendant or any of its agents;

(c)  Permanently enjoin Defendant, their agents, employees and successors from discriminating against any person in violation of Section 504 and 42 U.S.C. § 12203;

(d)  Award Plaintiffs appropriate compensatory damages against Defendant;

(e)  Award Plaintiffs attorney's fees and costs pursuant to 29 U.S.C. § 794(a); and

(f)  Provide Plaintiffs such other and further relief as this Court may deem just, proper and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure.

Respectfully submitted,

SAADY & SAXE, P.A.

By: *Daniel L. Saxe*

Daniel L. Saxe, Esq.
Fla. Bar. No. 102962
Claire Saady
Fla. Bar No. 102954
First Central Tower
360 Central Ave., Ste. 1160
St. Petersburg, FL  33701
Tel: (727) 291-1900
Email: dan@saadyandsaxe.com
*Attorneys for Plaintiff*